IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM HERBERT VILLAR,          :
                                 :
       Plaintiff,                :      CIVIL ACTION 11-0106-CG-M
                                 :
v.                               :
                                 :
TONY PATTERSON, et al.,          :
                                 :
       Defendants.               :

<u>REPORT AND RECOMMENDATION</u>

Plaintiff, an Alabama prison inmate proceeding *pro se* and

*in forma pauperis,* filed a Complaint under 42 U.S.C. § 1983.

This action was referred to the undersigned pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now

before the undersigned on the special report converted by order

to a motion for summary judgment of Defendants Dr. Pamela Barber

("Dr. Barber"), Nurse Nettles, Nurse Milton, Nurse Jernigan,

Nurse Andrews, Nurse Book, Nurse Carnley, Nurse Stabler, Dr.

Myles, Donny Myers (Health Services Administrator), Correctional

Medical Services ("CMS")[1], and Warden Tony Patterson ("Warden

Patterson") (Docs. 24, 37, 39, 40); Plaintiff's Amended

Complaint (Doc. 6); Plaintiff's oppositions (Docs. 38, 41); and

affidavits (Docs. 45, 49).

---

[1] CMS is now known as Corizon (*see* Doc. 50), but for purposes
of this action will be referred to as CMS.

For the reasons stated below, it is recommended that the motion for summary judgment of Defendants be granted, and that Plaintiff's action against these Defendants be dismissed with prejudice.

## I.  SUMMARY OF FACTUAL ALLEGATIONS

1.  From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation.

2.  At the time of the incident made the basis of this litigation, Plaintiff was an inmate incarcerated at the Holman Correctional Facility ("Holman"), specifically, in the segregation unit (Doc. 1, pp. 9, 11).

3.  Plaintiff claims he suffered three heart attacks prior to the December 6, 2010 incident; however, such occurrences appear to be prior to his incarceration since they are not reflected in his medical records except on his health intake form and the history section of other health forms (*see* Doc. 1, p. 11; Docs. 37-2, p. 129).[2]  Prior to December 6, 2010, Plaintiff was diagnosed with hypertension ("high blood pressure") and has regularly been given nitroglycerin for his

---

[2] Plaintiff was convicted as of December 2, 2005, and started serving his sentence as of January 13, 2006. *See Villar v. Furman*, Civil Action 07-0503-CG-C, at Doc. 1, p. 6 (S.D. Ala. July 13, 2007).

hypertension and chest pains since approximately May 2006 (*see* Doc. 37-2, pp. 1, 3-5, 7-8, 11, 21, 23-24, 26, 29-30, 32, 35-36, 39-41, 43, 45-46, 49-50, 52, 54-55, 57-62, 64, 66, 71, 74, 77, 80-81, 83, 87, 105; Doc. 37-3 pp. 18-19, 22, 23, 25, 27, 30-31, 34-36, 42-43, 45, 47-48, 53, 98-99, 130).

4.  On December 6, 2010, Plaintiff felt severe chest pains, shortness of breath, and his left arm became numb (Doc. 1, p. 11).

5.  Plaintiff was unable to get help until pill call early the next morning on December 7, 2010 (Doc. 1, p. 11).  At pill call, Plaintiff told Nurse Milton what had happened the previous night, and that he still felt numb and/or pain in certain places, had shortness of breath, and chest pain (Doc. 1, pp. 11-12).  Nurse Milton told Plaintiff to put in a sick call slip (*id.*).

6.  Four days later on December 10, 2010, Dr. Barber saw and examined Plaintiff (Doc. 37-3, p. 39; Doc. 37-3, pp. 81-82).[3] Doctor Barber noted on the Consultation Request form that the only objective finding was that Plaintiff's left arm was numb

---

[3] Plaintiff asserts he filled out a sick call slip, but between December 7, 2010 and December 10, 2010, no slip was evident in Plaintiff's medical records (*see* Doc. 37-2, Doc. 37-3).

(Doc. 37-3, p. 81). Plaintiff told Dr. Barber about the incident and the subsequent symptoms, and Dr. Barber ordered three EKG's (Doc. 1, p. 12). After reading the one decipherable EKG, Dr. Barber saw no obvious problem (Doc. 37-1, p. 2).

7.   Plaintiff was sent back to his isolated segregation cell after the EKG's were taken (Doc. 1, p. 12). Plaintiff continued to be given his blood pressure medication daily (*see* Doc. 1, p. 12).

8.   As a result of Plaintiff's visit with Dr. Barber on December 10, 2010, the doctor directed that Plaintiff be seen by an outside cardiologist (Doc. 37-1, p. 2). However, even after his visit with Dr. Barber, Plaintiff continued to complain to nurses about his symptoms, and how he was getting worse (Doc. 1, p. 12). Plaintiff was told again to put in a sick call slip (Doc. 1, p. 12).

9.   On December 16, 2010, Plaintiff was evaluated at the chronic disease clinic for a follow-up, and the clinic noted his chest pain from the prior week and a scheduled stress test (Doc. 37-3, p. 39).

10.  On December 22, 2010, Plaintiff had his regular yearly eye appointment at the Kilby Eye Clinic (Doc. 37-1, p. 2; Doc. 37-3, p. 79).

11.  Plaintiff sent a letter to Warden Patterson on December 29, 2010 requesting medical help, but no response from the Warden was received by the Plaintiff (Doc. 1, p. 14, 65-67). However, when Warden Patterson receives a letter from an inmate pertaining to a medical request, he does not ignore the letter, but rather pursuant to protocol sends the letter to the medical staff in order for inmates to have a proper medical evaluation (Doc. 40-1, p. 2).

12.  On December 29, 2010, Plaintiff was seen at the chronic disease clinic for follow-up (Doc. 37-3, p. 41). At the follow-up, unusual vital signs were noted, but no change in his medication was recommended (*id.*).

13.  On December 31, 3011 Plaintiff filled out a sick call slip and stated that his condition had worsened from three weeks ago, and Plaintiff's situation was deemed an emergency as of January 4, 2011 (Doc. 37-3, p. 107).  According to Dr. Barber, there was no indication prior to December 31, 2010 that Plaintiff was suffering from symptoms of a stroke (Doc. 37-1, p. 2).[4]

---

[4] Plaintiff states that on December 28, 2010, the following occurred.  While Nurse Booker was conducting pill call, she saw the Plaintiff and gave him a sick call slip which he filled out (Doc. 1, p. 13).  Nurse Booker ran an EKG with Nurse Andrews, Nurse Nettles, and Nurse Jernigan present during the EKG (Doc. (Continued)

14. On January 4, 2011, Nurse Jernigan completed a chest pain assessment form and an EKG was run on the Plaintiff (Doc. 37-3, p. 105-106). Nurse Jernigan advised Plaintiff that if he felt worse to return to the Holman care unit for the doctor to see him in the morning (Doc. 37-3, p. 106). However, from a review of the medical record, Plaintiff did not return to the Holman care unit or fill out a sick call slip the next day (*see* Docs. 37-2, 37-3).

15. On January 9, 2011, Plaintiff filled out a medical request slip (Doc. 37-3, p. 102) and Nurse Milton referred Plaintiff to be seen by the doctor on January 14, 2011 (Doc. 37-3, p. 102).

16. On January 11, 2011, the segregation board visited the segregation unit, and Plaintiff told Warden Bishop about his symptoms (Doc. 1, p. 15). Warden Bishop asked if Plaintiff had

---

1, p. 13). Nurse Andrews stated that Plaintiff had major blockage in his arteries and the other nurses concurred with this assessment (Doc. 1, p. 14). Nurse Andrews stated to the Plaintiff he would be seen the next morning; however, this did not happen (Doc. 1, p. 14). Nurse Andrews apologized to the Plaintiff and said that Plaintiff's file had been placed on the doctor's desk (Doc. 1, p. 14). However, from the review of Plaintiff's medical record, the Court finds that the placement of a sick slip occurred on December 31, 2010, the medical assessment by a nurse occurred on January 4, 2011, and the assessment involved different nurses than the ones recalled and identified by Plaintiff.

put in a sick call slip, and Plaintiff responded that he had put in several, but was ignored (Doc. 1, p. 15). Warden Bishop then stated that he would look into the situation, but Plaintiff did not receive a response from him (Doc. 1, p. 15).

17. Later in the day on January 11, 2011, Plaintiff told Officer Davis that Plaintiff planned on filing a deliberate indifference charge against Dr. Barber and Warden Patterson (Doc. 1, p. 15).

18. On January 12, 2011, Plaintiff was seen by Dr. Barber and asked what could be done for him (Doc. 1, p. 15; Doc. 37-3, p. 100). Plaintiff indicated that he had the same symptoms as he did on December 10, 2010, but that they had worsened (Doc. 1, p. 15). Dr. Barber ordered a nitrostat shot which was administered to Plaintiff by Nurse Stabler[5] (Doc. 1, p. 16). Also, Dr. Barber started Plaintiff on pain and other medication for one week (Doc. 1, p. 16) and noted that Plaintiff was going to be sent to the cardiologist for a stress test as previously scheduled (Doc. 37-3, p. 100). The doctor then sent Plaintiff back to the segregation unit (Doc. 1, p. 16).

19. On January 19, 2011, Plaintiff had a follow up eye appointment (Doc. 37-3, p. 75). Plaintiff stated that he was

---

[5] The Plaintiff incorrectly spells Stabler as Stappler.

told by the eye doctor he was supposed to see a heart specialist since he had "swelling on [his] eyeball" (Doc. 37-3, p. 75).[6] However, the consult form regarding the eye exam only noted that Plaintiff had a "possible macular lesion" and recommended that Plaintiff be referred to a retinal specialist (Doc. 37-3, p. 75).

20.  After the eye doctor appointment, Plaintiff complained to Nurse Langford about his symptoms, and was told to put in a sick call slip (Doc. 1, p. 18).  From a review of the record, Plaintiff did not put in a sick call slip at that time (*see* Docs. 37-2, 37-3).

21.  Plaintiff's cardiologist appointment occurred on January 31, 2011 at Cardiology Associates (Doc. 1, p. 18; Doc. 37-3, p. 70). The cardiologist gave Plaintiff a stress test, and the test yielded no cardiac abnormalities (Doc. 37-1, p. 2; Doc. 37-3, p. 70).  According to the doctor's notes, Dr. Barber sent Plaintiff to the cardiologist for a stress test due to the abnormal chest pains, but since the stress test results were

---

[6] According to Dr. Barber, on January 19, 2011, she was told by the eye doctor that Plaintiff had a stroke, but the record reflects that the consulting eye doctor did not directly note the possibility of a stroke in the medical notes.  Rather, such notation of a possible stroke was not written until March 2011 (Doc. 37-1, p. 2; see Doc. 37-3, pp. 66-67).

normal, Dr. Barber determined that no follow up was required (Doc. 37-3, p. 72).

22.    Plaintiff wrote a letter dated February 10, 2011 stating his grievance against the quality of care received (Doc. 6, pp. 14-21).  Plaintiff received a letter in response from Donny Myers which explained that Dr. Barber indicated that the cardiac studies were negative and the doctor did not see any acute problems (Doc. 6, pp. 2, 13).

23.    Plaintiff filed his Complaint on February 28, 2011 against Defendant Dr. Barber, Warden Tony Patterson, Nurse Andrews, Nurse Booker, Nurse Carnley, Nurse Jernigan, Nurse Milton, Nurse Nettles, and Nurse Stabler, in their individual capacities (Doc. 1, pp. 10, 11, 30).  He seeks damages for the "loss of [his] left arm, hand and left eye, in the amount of one (1) million dollars against the Defendants for refusal of medical treatment for now over two (2) and a half months, leaving Plaintiff/Petitioner in tremednous sever (sic) pain, in an isolated segeration (sic) cell, knowing his condition was deteriorating, and left untreated displaying cruel and unusual punishment, by deliberate indifference" and "compensatory damages in the amount of $500.00 dollars a day from each of the defendant's for each and every day Plaintiff/Petitioner left untreated in sever (sic) tremendeous (sic) pain, left to suffer,

and still suffering ... [and] denied any medical treatment for possible heart attack, and stroke" (Doc. 1, pp. 23-24).

24.  On March 24, 2011, Plaintiff received eye care at Eye Center South wherein the doctor noted that there was loss of vision in Plaintiff's left eye and indicated that the Plaintiff may have had a stroke (Doc. 6, p. 5; Doc. 37-3, pp. 66-68).

25.  On March 29, 2011, Plaintiff amended his Complaint to add Defendants, Dr. Myles (Doc. 6, pp. 1-6), Donny Myers in his individual capacity and as the owner of CMS, (Doc. 6, pp. 9-10) and CMS (Doc. 6, pp. 9-10).  Plaintiff requests emergency treatment, and seeks criminal charged against Dr. Barber, Dr. Myles, Warden Tony Patterson, and Donny Myers (Doc. 6, pp. 9-11).

26.  Plaintiff filed a grievance form on May 16, 2011 (Doc. 38, p. 3).  On May 17, 2011, Plaintiff received a response to his grievance, which explained that Dr. Barber was very aware of Plaintiff's condition, that there really was no treatment to reverse the effects of a stroke, and the fact that Plaintiff was using the bathroom on his self was a new complaint that the doctor was not aware of (Doc. 38, p. 4).

27.  On May 24, 2011 Defendants CMS, Donny Myers, Dr. Barber, Nurse Andrews, Nurse Booker, Nurse Carnley, Nurse Jernigan, Nurse Milton, Nurse Nettles, Nurse Stabler filed their

Answer denying Plaintiff's claims of deliberate indifference and delay in medical treatment, and asserted affirmative defenses (Doc. 24).

28. On June 6, 2011 Defendants Nurse Carnley, Nurse Andrews, Nurse Jernigan, Nurse Stabler, Nurse Nettles, Dr. Barber, CMS, Nurse Booker, Nurse Milton, Donny Myers filed their Special Report denying any violation of Plaintiff's constitutional rights, as well as including affidavits and Plaintiff's medical records as proof thereof (Doc. 37). Specifically, in Nurse Nettles' affidavit, she explains that the nurses at Holman do not diagnose patients and merely follow the orders of the doctor, and upon her review of the medical record at no time did the nurses refuse to provide care to Plaintiff (Doc. 37-4). Also, in Donny Myers' affidavit, he explains that he does not provide hands-on health care to inmates at Holman in his capacity as the Health Services Administrator (Doc. 37-5). Additionally, the attached medical records reflect that, subsequent to the December 6, 2010 incident, Holman medical personnel continued to give Plaintiff nitroglycerin for his hypertension and chest pain (Doc. 37-3, pp. 6, 8, 12, 16).

29. Plaintiff filed a response to Defendants CMS, Donny Myers, Dr. Barber, Nurse Andrews, Nurse Booker, Nurse Carnley, Nurse Jernigan, Nurse Milton, Nurse Nettles, Nurse Stabler's

Answer (Doc. 38) wherein he states he was seen by Dr. Barber on December 10, 2010, January 12, 2011[7], and January 31, 2011 (Doc. 38, p. 3).

30.   On June 13, 2011, Defendant Tony Patterson filed his Answer (Doc. 39) and Special Report (Doc. 40) denying any violation of Plaintiff's constitutional rights (Doc. 40-1).

31.   On June 28, 2011, Plaintiff filed a response to Defendants CMS, Donny Myers, Dr. Barber, Nurse Andrews, Nurse Booker, Nurse Carnley, Nurse Jernigan, Nurse Milton, Nurse Nettles, Nurse Stabler's Special Report (Doc. 41).

32.   Plaintiff also filed a request for oral argument in response to the Special Reports on June 30, 2011 (Doc. 44).

33.   On July 1, 2011 Plaintiff filed an Affidavit of Elizabeth Lawrence, which stated that on May 24, 2011 Defendant Warden Patterson engaged in conversation with Elizabeth Lawrence, Earl Villar, and Plaintiff, and he guaranteed Plaintiff would receive treatment; however, Plaintiff had not seen the doctor again as of June 29, 2011 (Doc. 45).  Plaintiff also filed an Affidavit of Earl Villar (Doc. 49), which

---

[7] The Plaintiff indicates it was January 2010, but from the sequence of events, the Court construes this to be in error, and should be January 2011.

reiterated the contents of the Affidavit of Elizabeth Lawrence, as stated above.

34.    On August 2, 2011, Defendant CMS filed an explanation that Defendant Myers is not the owner of CMS and not a doctor (Doc. 50).  Additionally, the filing explained that CMS is not aware of a Dr. Myles at Holman (Doc. 50).

35.    On August 3, 2011, the Court ordered that the Answers (Docs. 24, 39) and Special Reports (Docs. 37, 40) be converted to a Motion for Summary Judgment (Doc. 52).

36.    On September 6, 2011, Plaintiff filed a Motion requesting a trial by jury and that the district judge preside over this case, not a magistrate judge (Doc. 58).[8]

---

[8]   The request for a jury is due to be denied since it is untimely and thereby waived. *See* Fed. R. Civ. P. Rule 38 (b)  ("On any issue triable of right by a jury, a party may demand a jury trial by: (1) serving the other parties with a written demand--which may be included in a pleading--no later than 14 days after the last pleading directed to the issue is served ..."); Rule 7(a) (defining pleadings as follows: "Only these pleadings are allowed: (1) a complaint;(2) an answer to a complaint;(3) an answer to a counterclaim designated as a counterclaim;(4) an answer to a crossclaim; (5) a third-party complaint;(6) an answer to a third-party complaint; and(7) if the court orders one, a reply to an answer." ); *see also Burns v. Lawther,* 53 F.3d 1237, 1240-41 (11th Cir. 1995). Therefore, Plaintiff's motion for a jury trial is **DENIED**.  Also, the Plaintiff's request for a district judge to preside over this case is **MOOT** since the district judge is indeed presiding over this case, and has referred the motion for summary judgment to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4).

<u>II. SUMMARY JUDGMENT STANDARD</u>

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. It is well-established that summary judgment is proper-consistent with Federal Rule of Civil Procedure 56(c)-"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party. *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989). However, Rule 56(e) states that:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials--including the facts

> considered undisputed--show that the movant is
> entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## III. DISCUSSION

1. As set forth above, Plaintiff alleges in his Complaint that Defendants violated his rights under the Eighth Amendment by denying and/or delaying proper medical care for a stroke that occurred while Plaintiff was incarcerated in Holman (Docs. 1, 6).

2. The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

3. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

4. In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

*Sims*, 25 F.3d at 983 (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)).

5. To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need."  *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

16

6. A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994), overruled on other grounds by, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (internal quotation marks and citation omitted).

7. In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. *Farrow*, 320 F.3d at 1243.

8. "Deliberate indifference" entails more than mere negligence. *Estelle,* 429 U.S. at 106; *Farmer v. Brennan,* 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court

17

> explained in *McElligott* that "deliberate
> indifference has three components: (1)
> subjective knowledge of a risk of serious
> harm; (2) disregard of that risk; (3) by
> conduct that is more than mere negligence."
> *McElligott,* 182 F.3d at 1255; *Taylor,* 221
> F.3d at 1258 (stating that defendant must
> have subjective awareness of an "objectively
> serious need" and that his response must
> constitute "an objectively insufficient
> response to that need").

*Farrow*, 320 F.3d at 1245-46 (emphasis in original).

9. "Delay in access to medical attention can violate the

Eighth Amendment . . . when it is tantamount to unnecessary and

wanton infliction of pain." *Hill*, 40 F.3d at 1187 (internal

citations and quotation marks omitted). "Cases stating a

constitutional claim for immediate or emergency medical

attention have concerned medical needs that are obvious even to

a layperson because they involve life-threatening conditions or

situations where it is apparent that delay would detrimentally

exacerbate the medical problem." *Id.*

> The "seriousness" of an inmate's medical needs also
> may be decided by reference to the *effect* of delay in
> treatment. *Gaudreault,* 923 F.2d at 208; *Monmouth
> County,* 834 F.2d at 347. Where the delay results in
> an inmate's suffering "a life-long handicap or
> permanent loss, the medical need is considered
> serious." *Id.* An inmate who complains that delay in
> medical treatment rose to a constitutional violation
> ***must place verifying medical evidence*** in the record to
> establish the detrimental effect of delay in medical
> treatment to succeed. Further, we have held that
> "[t]he tolerable length of delay in providing medical
> attention depends on the *nature* of the medical need

and the *reason* for the delay." *Harris v. Coweta County,* 21 F.3d 388, 393-94 (11th Cir. 1994) (emphasis added). Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188-89 (emphasis in original and added) (footnotes omitted).

10. "It is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs." *Del Muro v. Federal Bureau of Prisons*, 2004 WL 1542216, *4 (N.D. Tex. 2004) (unpublished). As to "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995)(quoting *Estelle*, 429 U.S. at 107);

11. The Court assumes, for purposes of the parties' motion for summary judgment, that Plaintiff's stroke constitutes an objectively serious medical injury. Therefore, the Court turns to the second, subjective element of Plaintiff's claim, that is, whether Defendants were deliberately indifferent to Plaintiff's

serious medical need and delayed access to medical attention to
constitute a violation of the Eighth Amendment through the
various alleged actions.

###    1.   Defendant Doctor Pamela Barber

Defendant claims that Defendant Dr. Barber was deliberately
indifferent to Plaintiff's medical need.  The record before the
Court shows otherwise.  First, in order to constitute
"deliberate indifference" Defendant must have known of and
disregarded an excessive risk to Plaintiff's health.  *Farrow*,
320 F.3d at 1245-46.  Instead of disregarding Plaintiff's
health, Dr. Barber saw Plaintiff multiple times and determined a
certain course of action, exemplified as follows.  Dr. Barber
saw Plaintiff on December 10, 2010, which was four days after
Plaintiff first complained to Holman medical personnel[9] (Doc. 37-
3, pp. 39, 81-82).  In addition to examining Plaintiff, Dr.
Barber ran three EKG's on Plaintiff, and after reading the
readable EKG, saw no obvious problem (Doc. 37-1, p. 2).  Also,
Dr. Barber directed that Plaintiff be seen by an outside
cardiologist (Doc. 37-1, p. 2).  Additionally, Plaintiff was
referred to the doctor by Nurse Milton as scheduled on January

---

[9]     It is unknown if and when Plaintiff filled out a sick
call slip between December 7, 2010 and December 10, 2010 since
such is not contained in the record, but other sick call slips
were included in the record (*see* Docs. 37-2, 37-3).

14, 2011, but was actually seen earlier on January 12, 2011
(Doc. 37-3, p. 100, 102).  At the January 12, 2011 visit where
Plaintiff complained that his symptoms had worsened, Dr. Barber
ordered that a nitrostat shot be administered, and that
Plaintiff was to see the cardiologist as previously scheduled
(Doc. 37-3, p. 100; Doc. 1, p. 16).  On January 19, 2011, at an
eye doctor's appointment, Plaintiff was told by the eye doctor
that Plaintiff suffered a stroke (Doc. 37-3, p. 75).  On January
31, 2011, Plaintiff was seen be the cardiologist (Doc. 37-3, p.
70).  The cardiologist saw the Plaintiff and gave him a stress
test, and the cardiac studies were negative (Doc. 37-3, p. 70).
Dr. Barber decided, upon receipt of the negative stress test
that there were no acute problems (Doc. 6, pp. 2, 13).  Second,
the fact that Plaintiff disagrees with the treatment recommended
or simply would have preferred a different course of treatment
does not state a valid claim of medical mistreatment under the
Eighth Amendment.  *Del Muro*, 2004 WL 1542216 at *4.  Ultimately,
after seeing Plaintiff each time, Dr. Barber chose a course of
action based on the doctor's knowledge and opinion.  Dr. Barber
decided after seeing the results of the cardiologist's test that
Plaintiff did not have any remaining acute problems that could
be treated (Doc. 37-3, p. 70; Doc. 6, pp. 2, 13).  Merely
because Plaintiff disagrees with the course of treatment is not

equivocal to the doctor being deliberately indifferent to Plaintiff's serious medical need. Third, Dr. Barber recommended Plaintiff be scheduled for a stress test at the first visit on December 10, 2011, but Plaintiff was not seen by the cardiologist until January 31, 2011. In order to prove that a delay in seeing the cardiologist rose to the level of a constitutional violation, Plaintiff must place verifying medical evidence to show that the *delay*, not the stroke itself, resulted in a lifelong handicap or permanent loss. *See Hill*, 40 F.3d at 1188-89. However, Plaintiff has not placed any such verifying medical evidence into the record. Therefore, Defendant Dr. Barber did not violate Plaintiff's constitutional rights.

#### 2. Defendant Nurses Nettles

Plaintiff claims that Nurse Nettles was deliberately indifferent to his serious medical need. However, upon review of the record and Nurse Nettles' affidavit (Doc. 37-4), the Court finds that Nurse Nettles was not deliberately indifferent to Plaintiff's medical need since she did not see, treat, or refuse to treat Plaintiff and had no dealings with Plaintiff in connection with his December 6, 2010 stroke or treatment thereof.

3.   Defendant Nurse Milton

Plaintiff claims that Nurse Milton was deliberately indifferent to his serious medical need in violation of his constitutional rights.  However, the record reflects that Nurse Milton was not deliberately indifferent to Plaintiff's serious medical need.  *See Farrow*, 320 F.3d at 1245-46.

First, when Nurse Milton was first told about Plaintiff's stroke symptoms at pill call by Plaintiff himself, she told Plaintiff to put in a sick call slip so he could see a doctor (Doc. 1, pp. 11-12).  Plaintiff was seen four days later by Dr. Barber (Doc. 1, p. 13).  Also, as reflected in the record, on January 9, 2011 Nurse Milton gave Plaintiff a sick call slip so that he could see the doctor on January 14, 2011 (Doc. 37-3, p. 102).  Defendant Nurse Milton did not know of and ignore Plaintiff's serious medical condition, but made sure Plaintiff's request was properly made via a sick call slip so that Plaintiff would see the doctor.  On December 7, 2010 and the times thereafter, Plaintiff made complaints of pain, numbness, shortness of breath, and chest pain, but did not have any obvious visible symptoms of a serious medical issue that would render him incapable of filling out a sick call slip or completely incapacitated (Doc. 1, p. 11).  Second, as explained in Nurse Nettles' affidavit, nurses do not diagnose patients and

merely follow the order of the doctor and upon her review of the record, did not see where any nurse, including Nurse Milton, refused to provide care to Plaintiff (Doc. 37-4). Third, Nurse Milton provided medical care and assistance to Plaintiff despite her inability to diagnose Plaintiff, even though Plaintiff disagreed with the appropriateness of the treatment given by her. However, such is not enough to constitute deliberate indifference. *See Del Muro*, 2004 WL 1542216 at *4. Therefore, Defendant Nurse Milton was not deliberately indifferent to Plaintiff's medical need, and did not violate Plaintiff's constitutional rights.

### 4. Defendant Nurse Jernigan

Plaintiff claims that Nurse Jernigan was deliberately indifferent to his serious medical need in violation of his constitutional rights. However, the record shows otherwise. First, Plaintiff states that Nurse Jernigan ignored Plaintiff's verbal complaints at pill call (Doc. 1, p. 13). However, a sick call is necessary to see the doctor, and Nurse Jernigan did not have subjective knowledge that Plaintiff was in such harm that the situation would require the waiver of the sick call slip for Plaintiff to see a doctor. *See Farrow*, 320 F.3d at 1245-46. Plaintiff knew he needed to put in a sick call slip when he wanted to see a doctor, and the record reflects he did so in

24

connection with his stroke and symptoms thereof on two occasions (Doc. 37-3, pp. 102, 107). Thus, Nurse Jernigan did not ignore Plaintiff's request to see a doctor since they were not properly made and Plaintiff knew the proper protocol. Second, Plaintiff's complaints of chest pains were not ignored, but rather he continued to receive his hypertension and chest pain medication (Doc. 37-3, pp. 6, 8, 12, 16). Also, as a result of the December 31, 2011 submitted sick call slip, Plaintiff was seen on January 4, 2011, given an EKG, and assessed by Nurse Jernigan herself for chest pain (Docs. 37-3, p. 105-107). After Nurse Jernigan gave Plaintiff medical attention on the January 4, 2011 visit, she advised Plaintiff that if he felt worse to return to the Holman care unit for the doctor to see him in the morning (Doc. 37-3, p. 106). Next, as explained in Nurse Nettles' affidavit, nurses do not diagnose patients and merely follow the order of the doctor and upon her review of the record, did not see where any nurse, including Nurse Jernigan, refused to provide care to Plaintiff (Doc. 37-4). Therefore, Nurse Jernigan did not act deliberately indifferent to Plaintiff's serious medical need (Doc. 37-4). *See Farrow*, 320 F.3d at 1245-46. Additionally, merely because Plaintiff disagrees with the medical care given by Nurse Jernigan, her actions does not constitute deliberate indifference. *See Del*

*Muro*, 2004 WL 1542216 at *4. Therefore, Defendant Nurse Jernigan was not deliberately indifferent to Plaintiff's medical need, and did not violate Plaintiff's constitutional rights.

### 5. Defendants Nurse Andrews, Nurse Booker, Nurse Carnley, and Nurse Stabler

Plaintiff claims that Nurse Andrews, Booker, Carnley, and Stabler were deliberately indifferent to his serious medical need in violation of his constitutional rights. Plaintiff states that at his January 12, 2011 visit, Nurse Stabler administered a nitrostat shot to him per Dr. Barber's order (Doc. 1, p. 16). Plaintiff also states that Nurse Booker saw Plaintiff at pill call, gave him a sick call slip, and administered an EKG as Nurse Andrews, Nurse Booker, Nurse Jernigan and Nettles watched, and they all agreed that Plaintiff had major blockage in his arteries (Doc. 1, p. 14). In general, Plaintiff states that the nurses ignored him (Doc. 1, p. 13). Plaintiff makes no other specific allegation against Nurse Carnley.

The record does not show that the nurses generally ignored Plaintiff or were deliberately indifferent to his serious medical need. *See Farrow*, 320 F.3d at 1245-46. Merely because he did not see a doctor as he wished each time he verbally complained does not constitute a constitutional violation. *See Del Muro*, 2004 WL 1542216 at *4. Rather, the nurses continued

26

to administer Plaintiff's hypertension/chest pain medication to him (Doc. 37-3, pp. 6, 8, 12, 16), and the two times he submitted in a sick call slip he was seen by Dr. Barber (Doc. 37-2, p. 102, 107).  Also, Nurse Booker and Nurse Andrews cannot be construed to be deliberately indifferent for giving and/or watching an EKG be administered.  Also, Nurse Stabler cannot be construed to be deliberately indifferent for administering Plaintiff a nitrostat shot.  Rather, these actions demonstrate a lack of indifference since they gave Plaintiff actual medical attention to address his medical complaint.  Next, as explained in Nurse Nettles' affidavit, nurses do not diagnose patients and merely follow the order of the doctor and upon her review of the record, did not see where any nurse refused to provide care to Plaintiff (Doc. 37-4).  Also, regardless of their personal assessments of Plaintiff's condition, nurses are not allowed to diagnose Plaintiff, and any verbal comments regarding Plaintiff's blocked arteries were not formal medical diagnoses. Moreover, Plaintiff disagrees with the level and type of medical care he has received, which is a disagreement between him and medical personnel, but not an instance of deliberate indifference of his medical condition. *See Del Muro*, 2004 WL 1542216 at *4.  Therefore, Defendants Nurse Andrews, Nurse Booker, Nurse Carnley, and Nurse Stabler were not deliberately

indifferent to Plaintiff's medical need, and did not violate Plaintiff's constitutional rights.

### 6. Dr. Myles

Plaintiff claims Dr. Myles was deliberately indifferent to Plaintiff's serious medical need in violation of his constitutional rights (Doc. 6). However, there is no Dr Myles that treated or refused to treat Plaintiff, or that works at Holman (*see* Docs. 50; Doc. 37-2, 37-3). Therefore, the Court finds Plaintiff's claims against this fictional individual are due to be dismissed.

### 7. Donny Myers

Plaintiff claims that Defendant Donny Myers, in his individual capacity and as owner of CMS (the entity that employs Dr. Barber), was deliberately indifferent to Plaintiff's serious medical need which violates Plaintiff's constitutional rights (Doc. 6). However, Donny Myers is not the owner of CMS and is not a doctor (Doc. 50). Rather, Donny Myers is the Health Services Administrator ("HSA") at Holman and is employed by CMS (Doc. 37-5). As HSA, Donny Myers is responsible for overseeing the nursing staff and overseeing the grievances and complaints filed by inmate, but he does not provide hands-on care to inmates (Doc. 37-5). Defendant Donny Myers is also aware of the Plaintiff's medical condition and treatment thereof (Doc. 37-5).

Defendant Donny Myers did not provide any direct medical care or lack thereof to the Plaintiff in his individual capacity. Defendant Donny Myers does not own CMS, and is incorrectly sued in that capacity by Plaintiff. Also, Defendant is aware of Plaintiff's medical treatment, which demonstrates that Defendant is aware that medical treatment is being given to Plaintiff, but that Plaintiff is unsatisfied with his treatment. However, disagreement over medical treatment between an inmate and prison officials does not constitute deliberate indifference. *See Del Muro*, 2004 WL 1542216 at *4. Thus, Defendant Donny Myers was not deliberately indifferent and did not violate Plaintiff's constitutional rights.

## 8. Correctional Medical Services (CMS) now known as Corizon

Plaintiff alleges that because CMS employed Dr. Barber, and Dr. Barber violated Plaintiff's constitutional rights, that CMS also violated his constitutional rights (Doc. 6). However, as explained above, the medical staff Defendants did not violate Plaintiff's constitutional rights; therefore, CMS is also not liable for any violation of Plaintiff's constitutional rights.

## 9. Warden Tony Patterson

Plaintiff claims that Defendant Warden Patterson was deliberately indifferent to Plaintiff's serious medical need since he is responsible for the operations at Holman (Doc. 1, p.

10).  Specifically, Plaintiff claims that Warden Patterson
ignored Plaintiff's letters requesting help for his medical
condition since Plaintiff was being ignored by medical staff
(Doc. 1, pp. 14, 22).  Additionally, Plaintiff submitted the
affidavits of Elizabeth Lawrence (Doc. 45) and Earl Villar (Doc.
49) which set forth that on May 24, 2011 while Elizabeth and
Earl were visiting Plaintiff, Defendant Warden Patterson
inquired into Plaintiff's health and told Plaintiff and his
visitors that he did not know why Plaintiff was not being
treated, but that Plaintiff would receive any needed medical
treatment (Docs. 45, 49).

However, Defendant Patterson explains that he has not
denied or ignored Plaintiff's request for medical attention
(Doc. 40-1).  Rather, upon receipt of inmate letters that
pertain to a medical issue, Warden Patterson refers the letters
to medical staff for medical evaluation and treatment (Doc. 40-
1).  Therefore, while Plaintiff's letter remained unanswered
directly by Warden Patterson, the Warden pursuant to his usual
protocol referred Plaintiff's letter to medical staff so that
Plaintiff could receive medical attention (see Doc. 40-1).
Additionally, merely because Plaintiff did not see the doctor
between May 2011 and June 2011 does not equate to deliberate
indifference by Warden Patterson.  Instead of disregarding

Plaintiff's medical need, he directed letters to the medical staff and inquired into Plaintiff's health on May 24, 2011. Thus, the Court finds that Defendant Warden Tony Patterson did not violate Plaintiff's constitutional rights.

<u>IV.   CONCLUSION</u>

As set out above, Plaintiff has failed to establish the subjective element of his Eighth Amendment claim, and Defendants are entitled to summary judgment.  Based on the foregoing, it is recommended that the motion for summary judgment of Defendants Dr. Pamela Barber, Nurse Nettles, Nurse Milton, Nurse Jernigan, Nurse Andrews, Nurse Book, Nurse Carnley, Nurse Stabler, Dr. Myles, Donny Myers (Health Services Administrator), Correctional Medical Services, and Warden Tony Patterson be granted, and that Plaintiff's action against these Defendants be dismissed with prejudice.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 26th day of September, 2011.

<u>s/BERT W. MILLING, JR.</u>
UNITED STATES MAGISTRATE JUDGE

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

l.   *Objection*.   Any party who objects to this recommendation or
anything in it must, within fourteen (14) days of the date of
service of this document, file specific written objections with
the Clerk of this court.   Failure to  do so will bar a *de novo*
determination by the district judge of anything in the
recommendation and will bar an attack, on appeal, of the factual
findings of the Magistrate Judge.   *See* 28 U.S.C. § 636(b)(1)(C);
*Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v.
Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).   The
procedure for challenging the findings and recommendations of
the Magistrate Judge is set out in more detail in SD ALA LR 72.4
(June 1, 1997), which provides that:

> A party may object to a recommendation entered by a
> magistrate judge in a dispositive matter, that is, a
> matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing
> a 'Statement of Objection to Magistrate Judge's
> Recommendation' within ten days[15] after being served
> with a copy of the recommendation, unless a different
> time is established by order.   The statement of
> objection shall specify those portions of the
> recommendation to which objection is made and the
> basis for the objection.   The objecting party shall
> submit to the district judge, at the time of filing
> the objection, a brief setting forth the party's
> arguments that the magistrate judge's recommendation
> should be reviewed *de novo* and a different disposition
> made.   It is insufficient to submit only a copy of the
> original brief submitted to the magistrate judge,
> although a copy of the original brief may be submitted
> or referred to and incorporated into the brief in
> support of the objection.   Failure to submit a brief
> in support of the objection may be deemed an
> abandonment of the objection.

---

[4] Effective December 1, 2009, the time for filing written
objections was extended to "14 days after being served with a
copy of the recommended disposition[.]"  Fed.R.Civ.P. 72(b)(2).

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.    ***Transcript (applicable Where Proceedings Tape Recorded)***. Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.